UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

JUSTIN WOODARD,

                         Petitioner,

        -vs-                          **No. 6:13-CV-6123(MAT)**
                                      **DECISION AND ORDER**
PAUL CHAPPIUS, Superintendent,
Elmira Correctional Facility,

                         Respondent.

———————————————————————

## I.    Introduction

        Justin Woodard ("Woodard" or "Petitioner") filed a <u>pro</u> <u>se</u>
habeas corpus application pursuant to 28 U.S.C. § 2254, alleging
that he is being held in Respondent's custody in violation of his
federal constitutional rights. Petitioner's state custody arises
from a judgment entered on May 14, 2009, in New York State Supreme
Court, Monroe County, convicting him, after a jury trial, of Murder
in the Second Degree (N.Y. Penal Law ("P.L.") Law § 125.25(3)
(felony murder)) and Attempted Robbery in the First Degree (P.L.
§§ 110.00, 160.15(3)). Petitioner is serving concurrent sentences
aggregating 20 years to life in prison, plus five years of post-
release supervision.

## II.   Factual Background

        On January 14, 2007, at approximately 4:00 p.m., Kentrell
Monte Burks ("Burks") received a telephone call at home from
William "Bubba" Miller ("Miller"), with whom he had been friends

for seven or eight years. T.239-40, 243.[1] Burks referred to Miller as his "cousin" even though they were not blood relatives. T.286. Soon after Burks received the phone call, Miller arrived in a van driven by a heavy set, Hispanic-looking man, whom Burks identified later as Woodard. Accompanying them was Miller's girlfriend, whom Burks only knew as "Cha Chi", and several of Cha Chi's children. T.240-41. The person in the front passenger's seat passenger was a "skinnier guy, looked Hispanic, real slender[.][2]" T.241-42. At Miller's suggestion, they went to the Norton Street home of Miller's sister, Carmella Miller ("Carmella"), to play cards. T.244-45.

Miller and Carmella argued about her boyfriend, Keith Holloway ("Holloway"), having touched Carmella's youngest son in a sexual manner. T.245. Miller asked the children to demonstrate what Holloway had done, and they showed "hand gestures and fondling of the[ir] private areas." T.286. Burks, Miller, Petitioner, Brewer, Cha Chi, and the children all went to Miller's mother's new house

---

[1]

Numerals preceded by "T." refer to pages from the transcript of Woodard's trial. Numerals preceded by "H." refer to pages from the transcript of the pre-trial suppression hearing.

[2]

This individual was co-defendant Robert Brewer ("Brewer"). Respondent indicates that he and Miller also were charged with murder and tried separately, and both apparently were convicted of second-degree murder and sentenced to prison terms of 25 years to life. A Westlaw search does not reflect any appellate activity with respect to these convictions, suggesting that Brewer and Miller may not have completed their appeals.

in the Town of Gates or Greece. T.246-247, 282. Cha Chi stayed there with the children, while the others returned to Carmella's home. T.248, 289. Miller and his sister continued to argue about what Holloway had done. T.248.

At some point, Burks left with Miller, Petitioner, and Brewer. They made three or four stops in the area of Parsells Avenue, where Holloway stayed. T.248-50. According to Burks, "Miller kept talking about how he was going to rob or get at Keith Holloway" and "fuck 'em up." T.250. Petitioner was "not really doing too much," just "pacing back and forth." T.251. When the men returned to Norton Street, there was yet more arguing between Miller and his sister. T.251. According to Burks, Woodard and Brewer left the apartment for about 15 minutes and then returned. T.252.

Eventually, Miller had his sister call Holloway and ask him to come over to the Norton Street house. T.252. Burks tried to talk them out of it "[b]ecause William Miller had been drinking, the other guy had been drinking, [and there was] just a lot of animosity in the air." Id. Burks decided to leave, but before he could do so, Holloway arrived. T.252-53. At that point, Petitioner, Miller, and Brewer were all in the dining room. T.254-55. Burks "heard William Miller say, [']What up, nigger,['] and then I heard the [skinny] Hispanic guy [i.e., Brewer] say, [']Nigger, run it[.]'" T.254. Burks explained that the phrase, "run it", means, "Give it to me, I am robbing you, basically." T.254.

-3-

Burks looked over his shoulder and saw "the [skinny] Hispanic guy [i.e., Brewer] with the gun raised" and pointed at Holloway's head. T.253. Holloway put his hands over his face and started backing up. Burks then heard four or five gunshots, so he "got out of there". T.255. Burks did not see Holloway hit the ground and did not see what happened after he (Burks) started running.

Burks admitted on cross-examination that in his initial statements to the authorities, he falsely stated that he did not know who the shooter was. He explained that he was afraid of Woodard and Miller, who were not in custody and knew where he lived. According to Burks, Miller told him that he had better not talk; otherwise Miller was "going to come see [him]" next. T.256-58.

The autopsy performed on Holloway revealed multiple gunshot wounds as well as blunt force injuries to his skull. See T.407-10. Holloway sustained a gunshot wound through the head and one through the torso, each of which independently was sufficient to cause death. See T.417-19.

Rochester Police Department ("RPD") Investigator Neil O'Brien ("O'Brien") was assigned to investigate Holloway's death; he was assisted by Investigator William Lawler ("Lawler"). On November 8, 2007, a witness who was subject to a protective order viewed a "six-pack" photo array in the presence of O'Brien and Investigator Randy Benjamin ("Benjamin"). H.31-32, 55. The witness "immediately"

selected number 5 (Woodard's photo) and said, "That's him." The witness described Woodard as "the bigger of the two Hispanic looking people that were with [Miller] that were at the house that day on Norton Street." H.33, 57.

At various times during the ten months following the shooting, O'Brien and Lawler conducted investigations in Elmira, where Petitioner lived. H.12-13. On November 20, 2007, Lawler and O'Brien received a call that Petitioner was in custody in Elmira. The Elmira police, who did not have a warrant for Petitioner's arrest, transferred custody of him to the RPD investigators at a rest stop in Dansville. E.g., H.36, 54.

After being advised of his rights, T.37-38, Petitioner stated he understood them and said, "I'll talk." H.39-40. O'Brien then told Petitioner that they were investigating an incident involving Miller and his girlfriend, both of whom Petitioner said he knew from Elmira. O'Brien did not question Petitioner further about the incident until they arrived at the Public Safety Building in Rochester about an hour later. Woodard said that he would tell them what he knew if they would guarantee that he could go home that night. E.g., H.43, 61-62. After Benjamin spoke with an assistant district attorney, he relayed following message to O'Brien to give to Petitioner: If he told the truth, he would go home that night, but there was a "distinct possibility" that he could be arrested in the future for Holloway's murder. T.343.

Notwithstanding his potential exposure, Petitioner gave a written statement to the investigators in which he stated that on the day of the murder, he and Brewer had run into Miller, who said that his niece or nephew had been raped by someone named Holloway, a "big weed dealer" in Rochester. T.372. Miller "wanted to go to Rochester to rob the kid who raped his niece or nephew" and said that he needed ride, so Petitioner offered to drive him. T.372. Petitioner took his wife's van and drove Miller, Cha Chi, and Brewer to Rochester. T.373.

Petitioner "knew Biz [i.e., Brewer] had a gun because [he] saw it on the way up in the van" and because "Biz always has a gun and this was a small Smith & Wesson nine millimeter." T.374. Petitioner added that "Bubba [i.e., Miller] said that he had a gun, but [Petitioner] never saw it." T.374. The group first drove to Miller's mother's house and dropped off Miller's girlfriend. T.373. Then they picked up Miller's "cousin" (i.e., Burks) and drove around looking for the intended victim's car. T.373. Unsuccessful in their search, they drove to the residence of Miller's sister, Carmella, whose boyfriend, Holloway, was the intended victim. T.373.

According to Petitioner, Carmella called Holloway and told him to come over to her house. In the interim, Petitioner left for a period of time but returned to Carmella's house when he received a call from Miller telling him that "the boyfriend was on his way."

-6-

T.373-74. When Holloway arrived, Carmella let him in, Miller slammed the door closed, and Brewer pointed his gun at him. T.374. Miller asked him, "'Where's it at?'" When Holloway asked why they were doing this to him, Brewer struck him on the back of the head with his gun. T.374. Petitioner stated that

> [w]hen [Holloway] stood back up, Bubba asked again, "Where's it at?" The guy didn't respond and Biz shot at the floor toward his feet. Then the guy ran toward the back of the house into the kitchen. Biz ran after him with the gun in his hand and I heard four quick shots. I was at the door to leave out the house when I heard Bubba say, "Finish him." Then I heard one more shot.

T.374. Petitioner said that he, Miller, and Brewer left together in the van, and Miller threw the gun out of the window as they drove. T.375.[3]

Defense counsel called Carmella's neighbor, Alicia Thompkins ("Thompkins"), to impeach Burks on the following issues–that he did not go by any nickname other than "Trell" and that he had last worked at Department of Social Services ("DSS") as a security guard in 2006. Thompkins testified that on the date of the shooting, she met someone named "Turk" at Carmella's residence. Later that month, the police showed her a photograph of Burks. Thompkins recognized Burks as the person she knew as "Turk" when she ran into him at the DSS. T.487. This was in January of 2007, and he was working as a security guard.

---

[3]
Petitioner's grand jury testimony was read into evidence at trial as part of the prosecution's case-in-chief. See T.461-76.

The jury returned a verdict convicting Petitioner as charged in the indictment. The trial court sentenced Petitioner to an indeterminate prison term of 20 years to life on the murder count and a determinate term of 15 years, plus five years of post-release supervision, on the attempted robbery count. Those sentences were set to run concurrently with each other.

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. On June 15, 2012, the Appellate Division unanimously affirmed the conviction. People v. Woodard, 96 A.D.3d 1619 (4th Dep't 2012). The New York Court of Appeals denied leave to appeal on September 12, 2012. People v. Woodard, 19 N.Y.3d 1030 (2012).

Petitioner then filed a pro se petition for a writ of error coram nobis asserting that appellate counsel had rendered ineffective assistance by failing to argue that trial counsel had been ineffective for not objecting to a portion of the jury instructions in which the trial court stated that the prosecution did not have to prove Petitioner's guilt "beyond all possible doubt". The Appellate Division summarily denied the petition on November 9, 2012, and the New York Court of Appeals denied leave to appeal on January 22, 2013. People v. Woodard, 100 A.D.3d 1472 (4th Dept. 2012), lv. denied, 20 N.Y.3d 1015 (2013).

Petitioner filed the instant habeas petition (Dkt #1) on February 14, 2013, asserting the following grounds for relief: (1) the trial court erred at the suppression hearing in precluding the defense from inquiring into the circumstances of Petitioner's arrest by the Elmira police; (2) the trial court was deceived by the prosecutor's misrepresentation regarding the terms of the cooperation agreement, and thus erred in allowing the prosecutor to introduce Petitioner's grand jury testimony during his case-in-chief; (3) the trial court erred in refusing to re-open the suppression hearing; (4) the trial court erred in failing to instruct the jury as to the affirmative defense to felony murder; and (5) Petitioner was deprived of effective representation of counsel in that counsel (a) failed to move for a Dunaway[4] or Payton[5] hearing when a question arose as to whether the police had probable cause to arrest him; (b) failed to invoke a provision of the cooperation agreement as a basis for excluding Petitioner's grand jury testimony during the prosecution's direct case; (c) failed to investigate the circumstances surrounding Petitioner's arrest, which would have shown that he had invoked his right to counsel; and (d) failed to properly move for a trial order of dismissal and renew the motion at the close of evidence, thereby precluding appellate review of the sufficiency of the evidence.

---

[4]     Dunaway v. New York, 442 U.S. 200 (1979).

[5]     Payton v. New York, 445 U.S. 573 (1980).

Prior to Respondent filing his answer to the petition, Petitioner filed a motion to stay the petition or permit him to withdraw it without prejudice (Dkt #5). Respondent filed a declaration (Dkt #6) consenting to the withdrawal request but reserving the right to assert any untimeliness argument that might arise if and when Petitioner re-filed the petition. However, Respondent did not address Petitioner's alternative request for a stay.

Respondent then filed an answer to the petition on August 21, 2013 (Dkt #11), conceding that it was timely filed. Respondent admits that Petitioner has exhausted all but two of his claims. Petitioner filed a traverse in response to Respondent's opposition memorandum of law.

The matter is now fully submitted and ready for decision. For the reasons that follow, Petitioner's motion for a stay is denied. Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. Motion for a Stay

In Rhines v. Weber, 544 U.S. 269 (2005), the Supreme Court approved the stay-and-abeyance procedure outlined by the Second Circuit in Zarvela v. Artuz 254 F.3d 374, 380-82 (2d Cir.), cert. denied, 534 U.S. 1015 (2001), but held that it "is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court."

546 U.S. at 277. The Supreme Court explained that "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Id. (citing 28 U.S.C. § 2254(b)(2)). On the other hand, the Supreme Court noted, "it likely would be an abuse of discretion for a district court to deny a stay . . . if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." Id. at 278.

Petitioner asserts that he needs a stay in order to have "the opportunity to present Federal Constitutional issues which are outside the record" in "an appropriate post judgment motion in the State Courts." Dkt #5 at 1. The only issue he identifies with specificity is that he allegedly "suffered a Payton v. New York violation and his attorney failed to redress the matter of [P]etitioner being arrested in his home without an arrest or search warrant." Id. Petitioner faults counsel for "fail[ing] to investigate the circumstances of his warrantless arrest" and failing to "interview any of several witness [sic] to his warrantless arrest in his home." Id. at 2.

Here, as discussed further below, even if trial counsel had requested a Payton hearing and had succeeded in demonstrating a Payton violation, there would have been no effect whatsoever on the

-11-

verdict. Thus, trial counsel's alleged error did not result in prejudice, a necessary element of an ineffective assistance claim. Woodard's failure to demonstrate any prejudice proves fatal to his ineffectiveness claim. See Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (stating that a habeas petitioner "must satisfy *both* prongs of the two-part test articulated in Strickland [v. Washington], 466 U.S. 688 (1984)].") (emphasis added). Since the issue as to which Woodard seeks permission to litigate in state court is "plainly meritless", it would be an abuse of this Court's discretion to grant a stay. Accordingly, Petitioner's motion for a stay is denied with prejudice.

## IV.  Exhaustion

Respondent asserts that Petitioner has failed to exhaust two of his claims: that the trial court erred in declining to charge the statutory affirmative defense to felony murder, and that trial counsel was ineffective in failing to investigate the circumstances of his arrest. Respondent asserts that the jury instruction claim must be deemed exhausted but procedurally defaulted, and that the ineffective assistance claim remains unexhausted but may be denied pursuant to 28 U.S.C. § 2254(b)(2). In his traverse, Petitioner asserts that he has fully exhausted his state-court remedies with regard to all of his claims. However, Petitioner does not attempt to show that any procedural default should be exhausted.

In the interests of judicial economy, the Court will dispose of both of these claims on the merits. See Dunham v. Travis, 313 F.3d 724, 729-730 (2d Cir. 2002) (discussing Lambrix v. Singletary, 520 U.S. 518, 523 (1997) (stating that "hurdling" the procedural bar is justified by a habeas court when the merits of a claim are easily resolvable against the petitioner); 28 U.S.C. § 2254(b)(2) (authorizing courts to deny mixed habeas petitions on the merits).

## V. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Woodards' petition, filed in 2013. AEDPA "revised the conditions under which federal courts may grant habeas relief to a person in state custody." Kruelski v. Connecticut Superior Court for Judicial Dist. of Danbury, 316 F.3d 103, 106 (2d Cir.2003) (citing 28 U.S.C. § 2254). The Second Circuit has stated that "it is often appropriate in considering a habeas petition under the AEDPA for the federal court to go through two steps: first, the court determines what the correct interpretation of Supreme Court precedent is; second, if the state court's understanding or application of that precedent is determined to be erroneous, the federal court must still ask whether that error was a reasonable one." Kruelski, 316 F.3d at 106. Here, the Court need not determine whether Woodard's claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims fail even if the Court applies the less

deferential, pre-AEDPA standard. <u>Messiah v. Duncan</u>, 435 F.3d 186, 197 (2d Cir. 2006).

## VI. Merits of the Petition

### A.   Errors at the Suppression Hearing

#### 1.   Erroneous Limitation of Cross-Examination

Woodard asserts that the trial court erred during the suppression hearing by precluding defense counsel from inquiring into the basis for his arrest by the Elmira police, who then transferred custody of Woodard to RPD investigators. According to Woodard, had defense counsel been permitted to pursue that line of inquiry, he would have established that Woodard was arrested without probable cause by the Elmira police and, as a result, Woodard's subsequent statement to RPD Investigators O'Brien and Benjamin should have been suppressed.

These claims, which implicate Woodard's Fourth Amendment right to be free from unreasonable searches and seizures, must be assessed by reference to the Supreme Court's decision in <u>Stone v. Powell</u>, 428 U.S. 465 (1976). Under <u>Stone</u>, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494-95 (footnotes omitted). However, "[i]f the state provides no corrective procedures at all to redress Fourth

Amendment violations, federal habeas corpus remains available." Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc). In addition, the Second Circuit noted, habeas relief may be possible if "the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process. . . ." Id.

Here, both of Woodard's claims involve alleged errors that occurred during litigation of his Fourth Amendment claims at the pretrial suppression hearing and on direct appeal. Thus, New York State corrective procedures were not only available to Petitioner, but were employed by him. See, e.g., Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) (finding that petitioner had "ample opportunity to vindicate his Fourth Amendment rights in the state courts" when, inter alia, he "raised his Fourth Amendment argument on appeal" to the Second Department).

Whether there has been an "unconscionable breakdown" in the state corrective process depends on "the existence and application of the corrective procedures themselves" rather than on the "outcome resulting from the application of adequate state court corrective procedures." Capellan v. Riley, 975 F.2d 67, 71 (2d Cir. 1992). There has been no showing that the state failed to provide Woodard a full and fair opportunity to litigate the Fourth Amendment claims. In such case, the Stone bar on habeas relief is

"permanent and incurable. . . ." <u>Graham v. Costello</u>, 299 F.3d 129, 134 (2d Cir. 2002).

### 2. Denial of Motion to Re-Open Suppression Hearing

Woodard argues that the trial court erred denying defense counsel's motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 710.40(4)[6] to re-open the suppression hearing to explore the issue of whether Woodard's arrest by the Elmira police was based on probable cause. The Appellate Division held that Woodard failed to preserve this contention for review because his motion to reopen was based upon a different contention (that he invoked his right to counsel when he was arrested in Elmira, before being transported to meet with RPD officers). <u>Woodard</u>, 96 A.D.3d at 1619 (citation omitted). The Appellate Division also found that the suppression court had properly applied C.P.L. § 710.40(4) to deny the motion because Woodard possessed knowledge of the facts surrounding his arrest, which precluded them from being "considered additional pertinent facts" that could not have discovered earlier with reasonable diligence. <u>Id.</u> (quotation and quotation marks omitted).

---

[6] C.P.L. § 710.40(4) provides that if the defendant seeking reopening shows "that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion", the court "*may* permit him to renew the motion before trial. . . ." N.Y. CRIM. PROC. LAW § 710.40(4)(emphasis supplied).

Federal courts may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties *of the United States*." 28 U.S.C. § 2254(a) (emphasis supplied). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

The Court finds that Woodard's claim regarding the denial of his motion to reopen the suppression hearing presents solely a matter of state law. On direct appeal, Woodard relied upon a state statutory provision, C.P.L. § 710.40(4), in support of his argument concerning the denial of the motion to reopen the suppression hearing. Furthermore, as Woodard has conceded, the decision to reopen a suppression hearing is a matter of the trial court's discretion. See People v. Fuentes, 53 N.Y.2d 892, 894 (1981) (cited in Petitioner's Appellate Brief ("Pet'r App. Br.") at 22 (Dkt #10-1)). This claim accordingly is dismissed as not cognizable on federal habeas review. See Tirado v. Walsh, 168 F. Supp.2d 162, 170-71 (S.D.N.Y. 2001) (rejecting petitioner's characterization of claim that trial court improperly reopened suppression hearing as a due process claim based on the Fourth and Fourteenth Amendments; claim "was clearly a matter of state law" not cognizable on federal habeas review).

-17-

**B.   Error in Admitting Petitioner's Grand Jury Testimony During the Prosecution's Direct Case**

**1.   Factual Background**

On December 7, 2010, Woodard signed a cooperation agreement with the prosecution and the RPD, in which he agreed, <u>inter alia</u>, to take a polygraph examination, testify truthfully, and not engage in criminal conduct. <u>See</u> Respondent's Exhibit ("Resp't Ex.") B at 287-90. If he successfully completed the terms of the agreement, he would be permitted to plead guilty to attempted first-degree robbery in exchange for a five-year sentence. <u>Id.</u> at 288. However, if he failed to meet the agreement's terms, the prosecution could prosecute him for felony murder and attempted robbery. In the latter case, the agreement provided that "it is agreed that statements made by [Petitioner] during the pendency of this Agreement, regarding the crime specified above will not be used against him on the People's direct case in that prosecution" but "may be used for impeachment purposes and for rebuttal." <u>Id.</u> at 289. In addition, Woodard signed a waiver of immunity prior to testifying before the grand jury convened to consider charges against Brewer and Miller. The waiver stated that he "consent[ed] and agree[d] to the use against [him] of any testimony given by [him] upon any investigation, hearing, trial, prosecution or proceeding." Resp't Ex. B at 213.

On December 26, 2007, while incarcerated, Woodard was charged with promoting prison contraband, and on February 28, 2008, he

pleaded guilty and received a sentence of time served. Resp't Ex. B at 285. Defense counsel terminated the cooperation agreement in a letter dated June 23, 2008. Id. at 279. The prosecutor later agreed to consider reinstating the agreement if Woodard passed a polygraph test, which he was unable to do. Id. at 285. The prosecutor accordingly did not reinstate the cooperation agreement. Id.

When the prosecution sought at trial to introduce Woodard's grand jury testimony in its case-in-chief, defense counsel objected on the basis that Woodard's written confession to the police was "the same as what he testified to before the Grand Jury," and that the grand jury testimony would confuse the petit jury because Woodard was acting as a prosecution witness when he testified before the grand jury. 3/20/09 Transcript ("Tr.") at 10-11. Defense counsel did not reference the terms of the then-terminated cooperation agreement. The prosecutor responded that Woodard's testimony constituted an admission, and that he had "waived immunity before he testified" in the grand jury and "signed a contract that was very clear that in the-that that information could be used against him in some future point in time. Id. at 12. The trial court ruled that the prosecutor would "be able to use [the testimony]." Id. Trial counsel did not contest the prosecutor's statement that "the contract" permitted the use Petitioner's grand jury testimony against him. The trial court

agreed that the testimony constituted an admission and ruled that it would admit the testimony. Trial counsel did not object.

### 2.    The Arguments on Appeal

Woodard asserted on direct appeal that the trial court erred in permitting the prosecution to use his grand jury testimony in its direct case, in contravention of the cooperation agreement. The prosecution argued that the issue was not preserved for appellate review because although defense counsel sought preclusion of the grand jury testimony, he did so not on the basis that the cooperation agreement required it. Instead, defense counsel argued that because Woodard's written confession was "the same as to what he testified to before the Grand Jury," admission of the grand jury testimony constituted improper bolstering. See 3/20/07 Tr. at 11. Relying on C.P.L. § 470.05(2), the Appellate Division held that this claim was unpreserved for appellate review. Woodard, 96 A.D.3d at 1620 (citing N.Y. CRIM. PROC. LAW § 470.05(2)). In any event, the Appellate Division held, "any error is harmless inasmuch as the evidence is overwhelming and there is not a significant probability that he would have been acquitted if the alleged error had not occurred[.]" Id. at 1620-21 (quotation omitted). In particular, the Appellate Division noted, Woodard's statement to the police, which was consistent with the grand jury testimony, also was admitted into evidence, and the statement was corroborated by an eyewitness' testimony and physical evidence. Id. at 1621 (citation omitted).

Respondent now argues that the claim is procedurally defaulted as a result of the Appellate Division's reliance on an adequate and independent state ground, and, in any event, is without merit. The Court agrees that the claim is without merit and will bypass the procedural default issue in order to address the substance of the claim.

As Respondent argues, the prosecutor did not misrepresent the terms of the cooperation agreement to the trial court. Although the cooperation agreement did provide that in the event Petitioner failed to meet its terms, his statements could not be used against him on the prosecution's case-in-chief, the agreement did not indicate what might occur if it were terminated. Here, as noted above, Petitioner terminated the agreement by his attorney's letter of June 23, 2008, and the prosecutor declined to reinstate it after Petitioner failed his polygraph test. Thus, the cooperation agreement was no longer in effect. The only agreement in effect at the time of trial was the waiver of immunity, which did allow the prosecution to use Petitioner's grand jury testimony on its case-in-chief. Although the prosecutor might have articulated this point with more clarity, there was no outstanding agreement that precluded admission of Petitioner's grand jury testimony on the prosecution's case-in-chief. Thus, the introduction Petitioner's grand jury testimony was not done in violation of any legally operable contract. The only agreement in effect did permit the

introduction of that testimony. And, New York law provides that a defendant's grand jury testimony is admissible on the prosecution's case in chief as an admission. E.g., People v. Rodriguez, 73 A.D.3d 815, 816 (2d Dep't 2010) (collecting cases).

### C. Failure to Charge the Jury on the "Non-Slayer" Affirmative Defense to Felony Murder

Petitioner claims that the trial court erred in not instructing the jury regarding the "non-slayer" affirmative defense to felony murder set forth in P.L. § 125.25(3)). At trial, defense counsel argued that the charge was warranted because there was no evidence to support a determination that Woodard knew that the co-defendants' guns were loaded. The Appellate Division rejected this claim, finding that "[t]he evidence established that [Woodard] willingly drove the codefendants from Elmira to Rochester for the express purpose of robbing the victim and that defendant knew that the codefendants had guns with them for that purpose." People v. Woodard, 96 A.D.3d at 1619-20 (internal and other citations omitted). Thus, even viewing the evidence in the light most favorable to Woodard, the Appellate Division found, it did "not support the affirmative defense[.]" Id. (citations omitted).

The petitioner's burden when collaterally challenging the failure to issue an instruction is "even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). A petitioner must show that he was "erroneously deprived of a jury instruction to which he was

entitled under state law" before he can viably claim a violation of his due process rights. Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005); see also Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001).

Under New York State law, to be entitled to the "non-slayer" affirmative defense to felony murder, a defendant must establish, by a preponderance of the evidence, that he did not commit the homicidal act, or in any way solicit, request, command, importune, cause, or aid in the commissioner thereof; was not armed with a deadly weapon; had *no reasonable ground to believe" that any other participant was armed with a deadly weapon*; and had "no reasonable ground to believe" that any other participant "intended to engage in conduct likely to result in death or serious physical injury". See N.Y. PENAL LAW § 125.25(3)(a)-(d) (emphasis supplied). The charge must be given if the record includes evidence which, viewed in the light most favorable to the defendant, with all reasonably permissible inferences drawn in his favor, satisfies the essential elements of the affirmative defense. See People v. Steele, 26 N.Y.2d 526, 529 (1970). A jury must be instructed "on all claimed defenses which are supported by a *reasonable* view of the evidence—not by any view of the evidence, however artificial or irrational." People v. Butts, 72 N.Y.2d 746, 751 (1988) (emphasis in original).

-23-

Even when viewed in the light most favorable to Woodard, the evidence presented at trial at most supports a finding that Woodard did not commit or aid in committing the homicidal act and was not armed with a deadly weapon. No affirmative evidence was introduced to support the remaining two prongs of the non-slayer defense. See, e.g., People v. Caicedo, 651 N.Y.S.2d 110, 111 (2d Dep't 1996) (affirming denial of non-slayer defense in part because defendant's statement failed to "establish that he lacked knowledge that one of the participants had a gun" and established "only that he did not see a gun"). Here, Woodard stated to the police that he knew Brewer had a 9-mm handgun because he had seen it in the van. He also stated Miller told him he had a gun, although Woodard did not see it. Woodard's statement to the police was read into the record at trial. The jury consequently could not have found that Woodard reasonably believed no one was armed, the third element of the non-slayer defense.

In addition, Woodard told the police that he knew Miller, who claimed to be armed, wanted to rob Holloway, a reputed marijuana dealer in Rochester, in retaliation for allegedly molesting his sister's children. Miller needed a ride to Rochester so that he could find Holloway, and Woodard agreed to drive him. Brewer asked to go on the trip, and while they were all in the van, and Woodard saw that Brewer had a gun. In Woodard's own statement, he admitted that he knew at least one participant, who claimed to have a gun,

-24-

intended to forcibly steal money from an alleged drug dealer. In light of these facts, the jury could not have found that Woodard reasonably believed that no one intended to engage in conduct that could have seriously injured or killed Holloway, and thus Woodard also failed to establish by preponderating evidence the fourth element of the non-slayer defense.

Because Woodard has failed to make the threshold showing that the Appellate Division erred as a matter of state law in upholding the trial court's refusal to charge the non-slayer defense, this Court need not reach the question of whether his due process rights were violated. See Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001) (to grant habeas relief, court must find that the justification charge was required as a matter of New York state law; the failure to give the requested charge violated due process; and the state court's failure to issue the charge was "of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254").

**D.   Ineffective Assistance of Trial Counsel**

Woodard here raises the same errors of trial counsel that he asserted on direct appeal. The Appellate Division discussed the merits of the claims concerning counsel's failure to raise the probable cause argument and failure to make a specific motion for a trial order of dismissal, but held that the remaining two contentions regarding counsel's performance were "either outside

the record and thus not reviewable on direct appeal, or they [were] without merit[.]" People v. Woodard, 96 A.D.3d at 1621. (internal and other citations omitted).

Strickland, 466 U.S. 668, supra, announced a two-part test to determine if counsel's assistance was ineffective: A defendant first must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and second, that "there is a reasonable probability that, absent the errors [by counsel], the fact finder would have had a reasonable doubt respecting guilt." Id. at 687, 695. As discussed further below, the Court finds that all of Woodard's theories in support of his ineffective assistance of trial counsel claim are without merit under Strickland.

### 1.  Failure to Request a Dunaway or Payton Hearing

In the context of an alleged failure to raise a Fourth Amendment claim, Strickland requires the Court first to ask if the claim would have been successful. If so, the Court must ask whether "the verdict would have been different absent the excludable evidence" that was the fruit of the illegal arrest. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). Woodard asserts that trial counsel should have requested a Dunaway hearing to press his claim that his post-arrest statements were suppressible because there was no probable cause for his arrest under the circumstances known to the police. See Dunaway, 442 U.S. at 216–18. As the Appellate

Division noted, probable cause for Petitioner's arrest by Elmira police did exist, as evidence adduced at the suppression hearing established that Petitioner had been identified, prior to his arrest, in a photo array as a participant in the crimes. Woodard, 96 A.D.3d at 1620. Thus, Woodard cannot show that the request for a Dunaway hearing was likely to be successful.

Woodard also asserts that trial counsel should have moved for a Payton hearing to argue that the police arrested him without a warrant in his home, thereby rendering the subsequent identification procedure suppressible as the fruit of an illegal arrest. See Payton, 445 U.S. at 589. The Fourth Amendment clearly "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest", Payton, 445 U.S. at 576, in the absence of "exigent circumstances", Kirk v. Louisiana, 536 U.S. 635, 638 (2002). Even assuming that there was a Payton violation, Woodard would not have succeeded in obtaining suppression of the line-up identification on this basis. Neither the United States Constitution nor the New York State Constitution "require[s] the suppression of evidence of a lineup identification made after an arrest based on probable cause but in violation of Payton." People v. Jones, 2 N.Y.3d 235, 244-45 (2004). Here, the line-up identification was not "the product of" the Payton violation but instead flowed from the police having probable cause to believe that Woodard was involved in the Norton

Street shooting based on an eyewitness' photographic identification. <u>Jones</u>, 2 N.Y.3d at 243 ("Due to the lack of a causal relationship between the <u>Payton</u> violation and the lineup identifications in this case, the lineups were not the 'fruit of the poisonous tree.'") (citations omitted). Because the line-up identification would not have been suppressed based on any alleged <u>Payton</u> violation, Woodard cannot show that he was prejudiced by trial counsel's failure to request a <u>Payton</u> hearing.

### 2. Failure to Properly Preserve A Claim

Petitioner claims that in opposing the prosecution's request to seek admission of his grand jury testimony in its case-in-chief, trial counsel should have relied upon the provision of the cooperation agreement that would have foreclosed that attempt. As noted above, Petitioner, through trial counsel, terminated the agreement by letter, and the cooperation agreement was never reinstated. The only agreement in effect at the time of trial was the waiver of immunity contract, which did not preclude the prosecution from utilizing Petitioner's grand jury testimony in its direct case. The Court cannot say that trial counsel was objectively unreasonable in declining to rely on an agreement that no longer had any legal effect. Moreover, the Appellate Division found that any error in admitting the grand jury testimony was harmless, and therefore Petitioner has not demonstrated that he was prejudiced by counsel's alleged error.

### 3.   Failure to Investigate Petitioner's Arrest

Woodard contends that trial counsel was ineffective in failing to independently investigate the circumstances of his arrest. Supposedly, had he done so, trial counsel would have learned that Woodard had informed the Elmira police that he wanted an attorney, thereby making Woodard's later waiver of his constitutional rights at the Rochester police station invalid. The assertion that trial counsel did not render adequate performance in this regard is belied by the record. Trial counsel did move, by letter and formal motion, to re-open the suppression hearing on the basis that he did not learn, until after the suppression hearing, of Woodard's invocation of his right to counsel. However, as the trial court found, that fact was "easily capable of being shared with" counsel, and if Petitioner had withheld that information from counsel, "he did so at his own peril." Resp't Ex. B at 341. Where, as here, the client himself was in the best position to direct counsel's attention to the right-to-counsel issue, the subsequent attempt to fault counsel for not investigating that issue is specious.

### 4.   Failure to Make a Specific Motion for a Trial Order of Dismissal

Woodard asserts that trial counsel was ineffective in failing to make a specific motion for a trial order of dismissal, for purposes of preserving a claim that the evidence was legally insufficient. As the Appellate Division pointed out, Woodard's appellate counsel did not bother arguing on appeal that the

evidence was legally insufficient, which suggests that appellate counsel did not think it was one of Woodard's stronger issues. Although the claim was unpreserved, appellate counsel could have urged the Appellate Division to invoke its statutory authority to review the claim in the interests of justice. The fact that counsel did not do so suggests that she realized the claim had no reasonable probability of success. In these circumstances, the Appellate Division correctly found that "[t]he failure to provide a specific basis for a trial order of dismissal that had no chance of success does not constitute ineffective assistance of counsel . . . ." Woodard, 96 A.D.3d at 1621.

## VII. Conclusion

The application for a writ of habeas corpus is denied, and the petition (Dkt #1) is dismissed. Petitioner's motion for a stay (Dkt #5) is denied with prejudice. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     January 13, 2014
           Rochester, New York

-30-